## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EVA VIRGINIA JACKSON,** ) | |
| ) | **Case No. 23-cv-1024 (GMH)** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **DOUGLAS COLLINS,**[1] ) | |
| **Secretary of Veterans Affairs,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

In this employment discrimination action, Plaintiff Eva Jackson, who during the relevant period served as a Medical Administrative Specialist—also known as an Administrator of the Day—with the Washington, D.C. Veterans Affairs Medical Center Business Office, alleges that sexual harassment by another employee of that office, Jeffrey Bozeman, resulted in a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* She further contends that Defendant, Secretary of the Department of Veterans Affairs ("Defendant" or the "Agency"), failed to investigate her claims and failed to take prompt disciplinary action against Bozeman. The Agency has filed a motion for summary judgment arguing that the conduct Plaintiff alleges is not sufficiently severe or pervasive to constitute a hostile work environment and that the undisputed facts show that it acted promptly and effectively to address the alleged harassment.[2] For the reasons that follow, Defendant's motion for summary judgment is granted.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Defendant has been substituted in place of his predecessor. *See* Fed. R. Civ. P. 25(d).

[2] The documents most relevant to this Memorandum Opinion are: (1) Defendant's motion for summary judgment and its attached exhibits, ECF No. 28 through 28-12; (2) Plaintiff's opposition and its attached exhibits, ECF No. 33

## I.    BACKGROUND[3]

### A.    Factual Background

During the period in which the allegedly harassing conduct occurred—Fall 2020 to Spring 2021, approximately—Plaintiff was employed as an Administrator of the Day for the Washington, D.C. Veterans Affairs Medical Center Business Office (the "Business Office") at the GS-9 level.[4]

---

through 33-9; (3) Defendant's reply, ECF No. 34; (4) Plaintiff's errata, ECF No. 35 through 35-1; and (5) Defendant's errata, ECF No. 37.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] The requirements for summary judgment briefing are set out in Rule 56, this district's Local Civil Rule 7(h), and this Court's Procedures and Scheduling Order filed at ECF No. 13.  Rule 56(c) requires "[a] party asserting that a fact cannot be or is genuinely disputed [to] support the assertion" either by citing "particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56(e) provides that, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may "consider the fact undisputed for the purposes of the motion" and "grant summary judgment if the motion and supporting materials—including facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).  This district's Local Civil Rule 7(h)(1) provides that "[e]ach motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement."  LCvR 7(h)(1).  Oppositions are to be "accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  Id.  Further, "the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Id.  The undersigned's Procedures and Scheduling Order cautions that this Court "strictly adheres to the dictates of Local Civil Rule 7(h)" and additionally requires the party opposing summary judgment to "file a separate document" responding to each paragraph of the movant's statement of undisputed material facts "with a correspondingly-numbered paragraph indicating whether that paragraph is admitted or denied."  ECF No. 13 at 3–4.  That order also provides, like Local Civil Rule 7(h)(1), "[t]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such facts are controverted in the statement filed in opposition to the motion."  Id.

    The government filed a Statement of Material Facts not in Genuine Dispute ("Defendant's Statement of Undisputed Facts") that complies with Rule 56(c), Local Civil Rule 7(h), and this Court's Scheduling and Procedures Order.  See ECF No. 28-2.  Plaintiff, however, did not respond to that filing as required by those rules and that Order.  Instead, his opposition to Defendant's motion for summary judgment contains a four-and-a-half-page section headed "Factual Background" that sets out factual allegations and record citations but does not either identify whether any of those factual allegations are (a) intended to show that facts in Defendant's Statement of Undisputed Facts are, indeed, disputed, or (b) intended to present undisputed facts Plaintiff maintains are material.  In accordance with the Federal Rules of Civil Procedure, the Local Civil Rules, the Scheduling and Procedures Order, and prior precedent, the Court deems the properly supported assertions of fact contained in Defendant's Statement of Undisputed Facts to be admitted.  See, e.g., Booker v. D.C. Gov't, No. 19-cv-2639, 2023 WL 4156684, at *1 n.3 (D.D.C. June 23, 2023); Ladd v. Chemonics Int'l, Inc., 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (noting that, if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court should treat the movant's "factual assertions [that] are properly supported by the record . . . as admitted").

[4] "GS" stands for "General Schedule," which is a classification and pay system that "covers the majority of civilian white-collar Federal employees . . . in professional, technical, administrative, and clerical positions."  General Schedule Overview, U.S. Off. of Pers. Mgmt., https://www.opm.gov/policy-data-oversight/pay-leave/pay-sys-tems/general-schedule/#:~:text=The%20General%20Schedule%20(GS)%20classification,percent%20of%20the%

ECF No. 28-2, ¶¶ 2, 6, 23, 61–62.  In that position, she was responsible for operations in the hospital and was stationed at a desk at the front of the emergency room; she worked from 11:30 p.m. to 8:00 a.m.  *Id.*, ¶¶ 3–5.  Her supervisors were Kamaldeep Lidder, Deputy Chief of the Business Office and, above him, Heather Frazier, Chief of the Business Office.  *Id.*, ¶ 7.  Bozeman was a GS-8 overnight supervisor for the medical support assistants and worked at the front of the hospital to check in patients who came to the emergency room.  *Id.*, ¶¶ 16–17.  He worked from 11:30 p.m. to 7:30 a.m. *Id.*, ¶ 18.  His direct supervisor was also Lidder.  *Id.*, ¶ 22.  Bozeman had no supervisory authority over Plaintiff.[5]  *Id.*, ¶¶ 19–20.

Plaintiff testified—both at a hearing before an Equal Employment Opportunity Commission ("EEOC") Administrative Judge and at her deposition in this federal action—that she found Bozeman's conduct "odd," "weird," and "creepy."  *Id.*, ¶ 24; *see also* ECF No. 33-8 at 14 (EEOC Hearing Tr.); ECF No. 35-1 at 50 (Plaintiff's Dep. Tr.).  As an example, she noted that, on occasions prior to December 2020, he would sit in his car in the parking lot prior to his shift.  ECF No. 28-2, ¶ 25.  When she first met Bozeman in Fall 2020, he told her that he had "heard about" her.

_____

20employee's% 20salary [https://perma.cc/97DZ-B29T].  It has fifteen grades:  GS-1, which is the lowest, to GS-15, which is the highest.  *Id.*

[5] The Agency notes that Plaintiff herself denied that Bozeman had supervisory authority over her.  *See* ECF No. 28-2, ¶ 20 (citing ECF No. 35-1 at 54 (Plaintiff answering "No" to the questions "[W]as [Bozeman] your supervisor?" "Did you regard him as having any supervisory authority over you?" and "[Y]ou didn't report to him.  Right?")).  Plaintiff does not dispute that fact, but states only that Bozeman was also a supervisor in the Business Office.  *See* ECF No. 33 at 2 (citing Plaintiff's testimony that Bozeman "was a supervisor MSA in the business office," found at ECF No. 33-8 at 10); *id.* at 11 (asserting that Bozeman "was a supervisor" who "exercised supervisory authority" but not that he exercised such authority over Plaintiff).  Plaintiff also attaches an exhibit that, although presumably intended to suggest that Bozeman was her supervisor, undermines any such allegation.  It is an email from Bozeman dated December 22, 2020 (which was approximately the time he began working the overnight shift, *see* ECF No. 33-8 at 7) addressed to a number of VA employees—but *not* to Plaintiff—in which Bozeman asserts that he was "excited to join you all on the Overnight shift as your Supervisor."  ECF No. 33-1 at 2.  That email was forwarded to Plaintiff on June 12, 2022 (well after the events at issue here), by Linda Gaines, *see id.*, who seems to have been a co-worker of Plaintiff's to whom Plaintiff complained about Bozeman's conduct at the time it was happening, *see* ECF No. 33-8 at 12.  The email thus suggests that Bozeman did *not* exercise supervisory authority over Plaintiff (if he did, she would have been an addressee) or, at the very least, fails to support an allegation that he did.  The Court thus finds it undisputed that Bozeman did not in fact have authority over Plaintiff and Plaintiff knew that he did not have authority over her.

*Id.*, ¶ 23.  Thereafter, in approximately November 2020, Plaintiff noticed that he would sometimes sing her first name and was told that he would ask about her even if there was no work-related reason for them to interact.  *Id.*, ¶¶ 26–27; *see also* ECF No. 35-1 at 50.  Thomas Robinson, a co-worker of both Plaintiff's and Bozeman's, testified before the EEOC Administrative Judge that on approximately three occasions in 2020, Bozeman indicated to Robinson that Bozeman was inter-ested in Plaintiff romantically or sexually, including by commenting on her body.  *See* ECF No. 33-8 at 35.  Plaintiff testified that in November 2020, she was told—apparently by Robinson—that Bozeman had made comments about her body and that Bozeman would like to have a romantic relationship with her.  ECF No. 28-2, ¶ 27; *see also* ECF No. 35-1 at 50.  Robinson also testified that on one occasion he witnessed Bozeman position his body approximately twelve inches from Plaintiff's, causing her to tell Bozeman to leave her alone.[6]  ECF No. 33-8 at 36.  She did not report any such incidents to a supervisor in November or December 2020, although she was aware—through annual training and flyers posted around the workplace—that the Agency's sexual harassment policy instructed employees to notify their direct supervisors if they were experiencing such harassment.  ECF No. 28-2, ¶¶ 10, 12, 14–15, 28.

In mid-December 2020, in what Plaintiff identified at her deposition as "the first instance of sexual harassment that [Bozeman] direct[ed] toward [her]," Bozeman allegedly approached Plaintiff at the front desk where she was stationed and told her that he had heard there was a "fine

---

[6] It is not clear from the record when this incident occurred.  Nor does Plaintiff point to evidence that such behavior occurred more than once.  In her opposition to Defendant's motion for summary judgment, Plaintiff asserts, without citation to anything in the record, that Bozeman "positioned himself within inches of her body on a few occasions." ECF No. 33 at 10.  Earlier in that same document, Plaintiff cites Robinson's testimony at the EEOC hearing to support the assertion that "Bozeman invade[d] [Plaintiff's] personal space and press[ed] his body within inches of her body." *Id.* at 5 (citing ECF No. 33-8 at 36).  It is clear from that testimony that Robinson was recounting a single incident. *See* ECF No. 33-8 at 36 ("Once by the print machine he got up real close to her . . . .").

woman" working in the emergency department.[7]  ECF No. 35-1 at 43–44; *see also* ECF No. 28-2, ¶ 29.  Plaintiff further testified that on January 3, 2021, Bozeman approached her at her work-station, where she was looking at job openings in Seattle, and suggested that they should move to Seattle together; the next day (on January 4, 2021), he again approached her, rubbed her right arm for three to five seconds and told her that blue—the color she was wearing—was his favorite color; and on January 7, 2021, he approached her and, as they discussed a colleague who had tested positive for Covid, leaned into her and asked her to kiss him so he could see if she had the virus. ECF No. 28-2, ¶¶ 31, 33–35, 37.

During that first week of January 2021, Plaintiff attempted to meet with Lidder, her direct supervisor.  In a phone call on January 4, 2021, she asked for a meeting to discuss "issues" she was "having with your supervisor," but did not identify the issues or the employee.  *Id.,* ¶ 38–40. A meeting was set up for January 5, but Plaintiff and Lidder failed to connect.[8]  *Id.*, ¶ 41.  In an email to Lidder later that day, Plaintiff stated that she was having "issues . . . with one of [the] supervisor[s]," which she felt were "not [appropriate] for the workplace" and made her "uncom-fortable."  *Id.*, ¶ 42; *see also* ECF No. 33-9 at 72.  Lidder asked Plaintiff to meet with him in his office before her shift ended on January 6, 2021, but she did not do so.  ECF No. 28-2, ¶¶ 44–45. Instead, the morning of January 7, 2021, Plaintiff first asserted to Lidder that Bozeman was

---

[7] Plaintiff's opposition to the motion for summary judgment contends that Bozeman made that statement at "her first meeting with him," which was "in September 2020."  ECF No. 33 at 2.  However, the testimony cited as support makes clear that Plaintiff asserted that specific comment occurred the "first night that he was on night shift."  ECF No. 33-8 at 10.  She further testified that when Bozeman started working at the Business Office as a "supervisor MSA" in September 2020, he worked the evening shift, from 3:00 p.m. to 12:00 a.m., rather than the night shift.  *See id.* Bozeman testified that he was "overnight supervisor" for the medical support assistants in December 2020 and January 2021.  *Id.* at 10, 20.  And elsewhere, Plaintiff's counsel has asserted that it is undisputed that Bozeman began working the night shift in December 2020.  *See id.* at 7.  Thus, the Court deems it undisputed that the "fine woman" comment was made in December 2020.

[8] Specifically, Plaintiff asserted in an email that morning that no one answered when she rang the bell outside Lidder's office at 7:15 a.m.; Lidder responded that the ring was answered by employees who did not arrive until later in the day and that Plaintiff should have called him.  ECF No. 33-9 at 72.

harassing her in an email, in which she complained that Bozeman has said "very inappropriate things to her" and related the "fine woman" comment in mid-December; the suggestion that they move to Seattle on January 3, 2021; the arm-rubbing incident on January 4, 2021; and the request for a kiss on January 7, 2021. *Id.*, ¶ 46; ECF No. 33-9 at 68.

On January 7, 2021, after receiving Plaintiff's email, Lidder separately directed Plaintiff and Bozeman to have no contact with each other. ECF No. 28-2, ¶ 47. That same day, Lidder also informed Frazier, his boss, about the allegations and initiated "immediate fact finding" because "some of the accusations can be classified as sexual harassment." ECF No. 33-9 at 183; ECF No. 28-2, ¶ 48. Frazier, in turn, made a request that same day for someone to be assigned to conduct a fact-finding investigation to her supervisor, Associate Director Stanley Staton; Human Resources Employee Labor Relations Supervisor Kimberley Hawkings; and Chief of Quality Value and Safety Geri Adams. ECF No. 28-2, ¶ 49.

Plaintiff complained to managers that Bozeman continued to come to the emergency department after the January 7, 2021, no-contact instruction, which she indicated she found "intimi-dati[ng]." ECF No. 33-8 at 18. She testified that she had an in-person conversation with Lidder to let him know that she had twice seen Bozeman in the emergency room to speak with medical support assistants between January 7 and January 14. ECF No. 28-2, ¶ 51. According to Plaintiff, Lidder said that he would speak to Bozeman. *Id.*, ¶ 52. Plaintiff reported similar information to Lidder via email on January 14, 2021, asking him to require Bozeman to communicate with his medical support supervisees electronically. *Id.*, ¶¶ 53; ECF No. 33-9 at 84. Lidder did so that same day. ECF No. 28-2, ¶¶ 54–55. On January 24, 2021, Plaintiff informed Frazier via email that Bozeman had been in the emergency room on January 18, 2021. ECF No. 33-9 at 182. How-ever, she also confirmed that the two had not communicated since the imposition of the no-contact

rule.  ECF No. 28-2, ¶ 57.  On January 28, 2021, Plaintiff and Bozeman both received a memorialized reciprocal no-contact agreement, which is still in effect.  *Id.*, ¶ 59; ECF No. 33-9 at 243–44. Plaintiff testified in her August 2024 deposition that she had seen Bozeman in the emergency room a few times since January 2021, including on February 14, 2021, but reported only one incident in April 2021 to Lidder.  *See* ECF No. 28-2, ¶¶ 60–62; *see also* ECF No. 35-1 at 115–16, 121.  Plaintiff again confirmed that she and Bozeman had not communicated since January 7, 2021.  ECF No. 28-2, ¶¶ 57–58.

Meanwhile, on January 29, 2021, asserting that her claims were not being "addressed appropriately" by Business Office management, Plaintiff contacted Veterans Administration Police to initiate an investigation.  ECF No. 33-9 at 193.  Management was having difficulty finding someone outside of the Business Office to conduct the fact-finding.  *See* ECF No. 28-2, ¶ 50; *see also* ECF No. 33-9 at 133 (Deputy Chief of Business Operations Tania Bland noting "unsuccessful attempts" to assign someone outside of the Business Office to conduct fact-finding); *id.* at 168 (Frazier noting "the length of time it was taking to have someone assigned to conduct the fact finding"); *id.* at 191 (Frazier email explaining that "chaplain services and patient advocacy offices" were contacted to assist with fact-finding but they declined).  Management therefore tapped Tania Bland, deputy chief of the Business Office, to conduct the fact-finding because she was not in either Plaintiff's or Bozeman's chain of command.  ECF No. 28-2, ¶ 50; *see also* ECF No. 33-9 at 131, 133.  Ultimately, however, Stacy Childs, an Agency manager outside of the Business Office, was appointed to conduct the fact-finding on February 1, 2021.  ECF No. 28-2, ¶ 50.

On February 7, 2021, Plaintiff emailed Lidder to complain about the pace of the investigation, noting that she had reported her concerns a month before but had not yet heard from management and would be requesting time off to "deal with the anxiety that th[e] whole situation ha[d]

caused" her.  ECF No. 33-9 at 200.  On February 16, 2021, Bozeman was reassigned from the night shift—Plaintiff's shift—to the day shift.  ECF No. 28-2, ¶ 67; ECF No. 33-9 at 191.  On February 18, 2021, Veterans Administration Police informed Lidder that its investigation had found no indication of conduct that would amount to sexual harassment.  ECF No. 28-2, ¶ 68; *see also* ECF No. 33-9 at 171.  After interviewing Plaintiff, Bozeman, Robinson,[9] and others, Childs issued her fact-finding report on February 25, 2021, which found Plaintiff's allegations of sexual harassment by Bozeman unsubstantiated, noting, among other things, that Plaintiff "never verbalized to [Bozeman that] the comments or gestures were unwanted or unwelcome[]."  ECF No. 28-2, ¶ 69; ECF No. 33-9 at 215.  The report nevertheless recommended continuation of the no-contact agreement and sexual harassment training for both Plaintiff and Bozeman.  ECF No. 28-2, ¶ 70.  Bozeman was issued a letter of counseling on March 1, 2021, for creating an uncomfortable work environment and ordered to complete sexual harassment training; Bozeman did as instructed.  *Id.*, ¶¶ 71–72.  As noted, the no-contact agreement is still in effect.  *Id.*, ¶ 59.  In April 2021, Plaintiff declined the opportunity to be considered for other positions at the GS-9 level; she testified at her deposition that she believed her work situation was safe since Bozeman was no longer on the night shift.  *Id.*, ¶ 66.

## B.    Procedural History

Meanwhile, Plaintiff contacted an Equal Employment Opportunity counselor on January 21, 2021, identifying the four instances of allegedly harassing conduct—that is, the "fine woman"

---

[9] Based on Robinson's testimony at the EEOC hearing that he could not remember being interviewed by Childs, Plaintiff contends that Robinson was not interviewed as part of the fact-finding.  ECF No. 33 at 5 (citing ECF No. 33-8 at 36).  That assertion is flatly contradicted by the written record in this case, which includes Childs' notes of her interview with Robinson, *see* ECF No. 33-9 at 241–42; the fact-finding report itself, which lists Robinson as an interviewee, *see id.* at 213; and testimony from the EEOC hearing confirming that Childs interviewed Robinson, *see* ECF No. 33-8 at 32–33.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

comment of mid-December; the suggestion that they move to Seattle of January 3, 2021; the arm-rubbing incident of January 4, 2021; and the request for a kiss of January 7, 2021—that she had raised with Lidder on January 7, 2021. ECF No. 28-2, ¶¶ 75–76. After an investigation, Plaintiff opted for a hearing before an EEOC Administrative Judge. *Id.*, ¶ 77. In her decision announced at the end of the hearing on January 9, 2023, the Administrative Judge generally credited Plaintiff's version of events and noted that Childs' determination that Plaintiff's claims of a hostile work environment "incorrectly rested in part on the idea that [Plaintiff] had to make her displeasure explicit [to Bozeman] in order to be able to allege harassment." ECF No. 28-14 at 8–9, 13. The Administrative Judge nevertheless found the conduct Plaintiff complained of was not sufficiently severe or pervasive to constitute a hostile work environment and that the Agency took prompt and effective corrective action and so entered judgment in favor of the Agency. *Id.* at 15–16. The Agency issued a final order adopting the Administrative Judge's decision on January 12, 2023. ECF No. 28-2, ¶ 78. Plaintiff filed this action on April 12, 2023. ECF No. 1.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleading' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting

*Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)).  Indeed, a court's role in

deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to]

decide only whether there is a genuine issue for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d

at 604).  Moreover, district courts approach summary judgment motions in employment discrimi-

nation or retaliatory action cases with "special caution" due to the "potential difficulty for a plain-

tiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F.

Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C.

Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)).  Nonetheless, a

plaintiff is still obligated to support his or her allegations by competent evidence. *Id.* Accordingly,

a plaintiff may not avoid summary judgment through "conclusory allegations and speculation."

*Id.*

### B.    Hostile Work Environment Based on Sexual Harassment

The federal sector provision of Title VII provides that "'[a]ll personnel actions affecting

employees . . . in executive agencies . . . shall be made free from any discrimination based

on . . . sex,' and thus makes it unlawful for a supervisor in a covered federal agency to create a

hostile environment based upon an employee's sex." *Taylor v. Solis*, 571 F.3d 1313, 1318 (D.C.

Cir. 2009) (ellipses in original) (citation omitted) (quoting 42 U.S.C. §§ 2000e-16(a)).  To establish

a claim of hostile work environment based on sexual harassment, a plaintiff must establish:

> (1) she is a member of a protected class; (2) she was subjected to unwelcome har-
> assment; (3) the harassment occurred because of her gender; (4) the harassment
> affected a term, condition, or privilege of employment; and (5) there is a basis for
> holding the employer liable for the creation of the hostile work environment.

*Johnson v. Shinseki*, 811 F. Supp. 2d 336, 345 (D.D.C. 2011).  Sexual harassment creates a hostile

environment "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and

insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)).  To be actionable, "a sexually objectionable environment must be both objectively and subjectively offensive, [that is,] one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

"An employer's liability for a hostile work environment sexual harassment claim differs depending on who does the harassing." *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999).  Where the harasser is the plaintiff's supervisor, "courts have made it easier to hold the employer liable on a vicarious liability theory." *Johnson*, 811 F. Supp. 2d at 347.

> If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable.  But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

*Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013) (citing *Faragher*, 524 U.S. at 807; *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998)).  If the harasser is a co-worker rather than the plaintiff's supervisor, "the employer is liable only if it was negligent in controlling working conditions." *Id.*  An employer will be found negligent "if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry*, 195 F.3d at 660.  That is, although "the reasonableness of an employee's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle" if the harasser is not her supervisor, because "she bears the burden of establishing her employer's negligence," whereas if the harasser is her supervisor, the employer has the burden "to prove its own reasonableness and the plaintiff's negligence." *Id.*

### III.    DISCUSSION

The Agency makes two arguments that it is entitled to summary judgment:  (1) that Plaintiff has failed to establish facts that would allow a reasonable jury to find a sufficiently abusive work environment, and (2) that, even if Plaintiff was the victim of a hostile work environment, the un-disputed facts establish that the government is not liable for its creation.  *See* ECF No. 28-1 at 11–23.  It is correct on both counts.

### A.    **Hostile Work Environment**

To begin, it is useful to catalogue the incidents that Plaintiff's opposition to Defendant's motion for summary judgment, if generously read, appears to argue resulted in a hostile work environment based on sexual harassment, *see* ECF No. 33 at 2–5, 9:

(1)    Bozeman's comment in September 2020 that he had heard about Plaintiff.  ECF No. 28-2, ¶ 23.

(2)    Comments Bozeman made to Robinson about Plaintiff, which Plaintiff was told of in November 2020.  *Id.*, ¶ 27; *see also* ECF No. 35-1 at 50.

(3)    Incidents in which Bozeman would sing her name or ask about her, which she no-ticed or was informed of in November 2020.  *See* ECF No. 35-1 at 50–51.

(4)    Bozeman's habit of sitting in his car before his shift, which she observed prior to December 2020.  *See* ECF No. 28-1, ¶ 25.

(5)    An incident on an unidentified date in which Bozeman positioned his body within twelve inches of Plaintiff's, prompting her to tell him to leave her alone.  *See* ECF No. 33-8 at 36.

(6)    Bozeman's "fine woman" comment in mid-December 2020, which Plaintiff char-acterized at her deposition as the first incidence of sexual harassment directed at her.  ECF No. 35-1 at 43–44; *see also* ECF No. 28-2, ¶ 29.

(7)    Bozeman's comment on January 3, 2021, that Plaintiff and he should move to Se-attle together.  ECF No. 28-2, ¶ 31.

(8)    Bozeman's comment on January 4, 2021, while rubbing Plaintiff's arm that blue was his favorite color.  *Id.*, ¶¶ 33–35.

(9)     Bozeman's request on January 7, 2021, that Plaintiff kiss him.  *Id.*, ¶ 37.

(10)    Bozeman's presence in the emergency room during Plaintiff's shift twice between January 7 and January 14, 2021, after each of them had been ordered not to contact the other.  *Id.*, ¶ 51.

(11)    Bozeman's presence in the emergency room during Plaintiff's shift on January 18, 2021.  ECF No. 33-9 at 182.

(12)    Bozeman's presence in the emergency room during Plaintiff's shift on February 14, 2021.  ECF No. 28-2, ¶ 60.

(13)    Bozeman's presence in the emergency room during Plaintiff's shift on two or three occasions in the two years following February 14, 2021, including on April 15, 2021.  *Id.*, ¶¶ 61–62.

The earliest any of those occurred is September 2020, when Bozeman began work at the Business Office.  Bozeman sporadically engaged in behaviors that Plaintiff found weird or creepy or odd, such as singing her name and sitting in his car before his shift.  She learned in November 2020 that Bozeman had made sexualized comments about her to Robinson.  Plaintiff testified that she first felt harassed when Bozeman made the "fine woman" comment in mid-December.  Thereafter, a handful of incidents that can be characterized as overtly romantic or sexual occurred between January 4 and January 7, 2021.  After January 7, 2021, Plaintiff and Bozeman did not communicate, although they were within visual range of each other a few times, including in January, February, and April 2021.

Plaintiff's claim is weakened because no reasonable person could find that some of the conduct she asserts was harassing contributed to an abusive workplace.  As noted, Plaintiff testified at the EEOC hearing that she found "intimidati[ng]" Bozeman's occasional presence in the emergency room during her shift after the no-contact order of January 7, 2021.  ECF No. 33-8 at 18.  She clarified at her deposition that the two did not communicate with each other on any of those occasions.  *See* ECF No. 35-1 at 120, 130.  She could not even say that Bozeman looked at her or

saw her—she merely assumed that because she saw him, he saw her.  *See id.* at 121.  That is, she seems to contend that Bozeman's mere presence in her vicinity was harassment.  Although courts have found that "in some cases the mere presence of an employee who has engaged in *particularly severe or pervasive harassment* can create a hostile working environment," *Ellison v. Brady*, 924 F.2d 872, 883 (9th Cir. 1991) (emphasis added), those cases are a far cry from this one.  For example, a reasonable person could find that the mere presence of an individual whom the plaintiff claimed had previously drugged and sexually assaulted her created an abusive environment.  *Connors v. Jim Shorkey Fam. Auto Grp.*, No. 17-cv-1003, 2018 WL 621285, at *2 (W.D. Pa. Jan. 30, 2018).  On the other hand, the Seventh Circuit has found that misconduct that "consisted of [the plaintiff's] supervisor placing his hand on [her] leg above the knee, rubbing his hand along her upper thigh, forcibly kissing her, and lurching at her from behind bushes" was "insufficiently severe or pervasive to cause [the] supervisor's mere presence to render the employee's environment hostile."  *Adusumilli v. City of Chicago*, 164 F.3d 353, 362 (7th Cir. 1998) (describing *Saxton v. AT&T Co.*, 10 F.3d 526, 536 n.18 (7th Cir 1993)); *see also, e.g.*, *Ward v. District of Columbia*, 950 F. Supp. 2d 9, 22 (D.D.C. 2013) (dismissing the contention that an alleged harasser's mere presence could support a hostile work environment claim where the only prior offensive conduct was two isolated sexualized comments).  More, where, as here, any allegedly harassing behavior stopped, courts have rejected the argument that the mere presence of the alleged harasser contributed to a hostile work environment.  *See Johnson v. Ohio Dep't of Com.*, No. 05-cv-82, 2007 WL 9734641, at *15 (S.D. Ohio July 26, 2007) ("After the October 2001 EEO report, Poellintz did not again engage in sexually harassing conduct toward Johnson.  He did come into her work area, which made Johnson uncomfortable.  But the Court cannot say that Poellintz's mere presence in Johnson's work area constituted severe or pervasive sexual harassment."); *see also Johnson v. ITT*

*Indus., Inc.*, 41 F. App'x 73, 74 (9th Cir. 2002) ("The district court also correctly granted summary judgment in favor of ITT on Plaintiffs' claims arising from the termination of their employment. The mere presence of the harasser, after his return from a suspension, did not create a hostile work environment from the perspective of a reasonable person because no additional incidents occurred.").  In line with those cases, the Court finds that Bozeman's presence in the emergency room after January 7, 2020, is not properly considered as part of the alleged hostile work environment.[10]

The remainder of behavior Plaintiff has alleged—although much of it is unquestionably inappropriate—does not meet the "demanding legal standard for a hostile work environment." *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77 (D.D.C. 2013).  To determine whether harassment is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," the Court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting *Harris*, 510 U.S. at 21).  It is worth noting here that Plaintiff did not perceive much of the conduct at issue as harassing at the time it occurred.  She testified at her deposition that she found Bozeman's habits of singing her name and asking about her "odd and weird," but she "didn't really pay him any attention."  ECF No. 35-1 at 50.  The Court does not suggest that such conduct should be disregarded on that account—a pattern of harassing behavior may not become clear until a victim feels its cumulative effect.  *See, e.g.*, *Cotton v. Carl Eric Johnson, Inc.*, No. 16-cv-72, 2018 WL 1427938, at *1 (N.D. Ga. Mar. 22, 2018) ("[W]hile Plaintiff did state that Fisher's dancing and humping did not hurt Plaintiff's feelings, offend him, or otherwise harm him in any way,

---

[10] Including them in the analysis would make no difference to the Court's ultimate decision, however.

review of the deposition transcript shows that the statement was made in the context of Plaintiff's first month of employment and that other testimony supports Plaintiff's allegation that later, after many requests for Fisher to stop, Fisher's cumulative conduct began to hurt Plaintiff's feelings, offend him, and harm him emotionally . . ."); *but see Goode v. Billington*, 932 F. Supp. 2d 75, 89 (D.D.C. 2013) (suggesting that, if at the time of an incident, the plaintiff did not perceive it to be harassment based on protected characteristic, the incident does not meet the subjective element of a hostile work environment claim); *Azon v. Metro. Transp. Auth.*, No. 00 Civ. 6031, 2002 WL 959563, at *4 (S.D.N.Y. May 9, 2002) (similar).[11]  However, it is relevant that much of Bozeman's conduct was not so severe or offensive as to immediately seem harassing.

In any event, caselaw from courts in this district establish that no reasonable factfinder could interpret the conduct Plaintiff complains of here as creating a hostile work environment.  For example, in *Bergbauer*, the court noted precedent finding "acts of sexual harassment . . . including touching plaintiff's buttocks and thigh, calling her beautiful, and asking her to accompany him on a weekend trip" were not sufficiently severe or pervasive to make out a hostile work environment claim; nor were "isolated incidents" of a co-worker caressing the plaintiff's knee, placing her breast on his arm, and placing her fingers on his buttocks.  934 F. Supp. 2d at 77 n.20 (first citing *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 97–99 (D.D.C. 2007); and then citing *Carter v. Greenspan*, 304 F. Supp. 2d 13, 25 (D.D.C. 2004)).  The court in *Coles v. Kelly Services, Inc.*, found that a supervisor forwarding ten sexually explicit emails and discussing a sexual exploit over the course of a month did not make out a hostile work environment.  287 F. Supp. 2d 25, 31 (D.D.C. 2003).  In *Tucker v. Johnson*, the court found allegations that, in a period of a few months, a co-worker repeatedly commented on the plaintiff's clothes and perfume, made a remark referring

---

[11] The Court does not read Defendant's motion to contend that Plaintiff did not subjectively find Bozeman's conduct severe or pervasive.  Indeed, the motion does not address the subjective element in any detail.

to the plaintiff's breasts, followed her around, and on several occasions snuck up behind her and then loomed over her to look down her shirt "d[id] not rise to the level of severity and pervasiveness that courts in this District require to establish a claim of hostile work environment." 211 F. Supp. 3d 95, 100–01 (D.D.C. 2016). In *Cunningham v. Ramjay Inc.*, the court found that a supervisor pressing his body against the front of the plaintiff's car, making a sexual gesture, and asking her for a hug; commenting on her breasts; telling her that he had a "dirty mind"; implying that she missed him when he was away; phoning her at home in the early hours of the morning; and forcing her to pull down her mask so he could see her face, then calling her "'cute, his 'type,' and 'thick,'" which occurred over the course of two months, amounted merely to "'a few isolated incidents of offensive conduct' and [was] thus neither so severe nor so pervasive to give rise to an actionable hostile work environment." No. 22-cv-931, 2023 WL 8803431, at *2, *6 (D.D.C. Dec. 20, 2023) (first quoting the record; and then quoting *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)). These cases, which recount conduct similar to—and sometimes more serious than—Bozeman's, over similarly abbreviated periods of time, establish that Plaintiff has not alleged conduct "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." [12] *Oncale*, 523 U.S. at 78.

## B.    Defendant's Response to Plaintiff's Complaints

Even if Plaintiff had established that Bozeman's conduct was sufficiently severe or pervasive to create a hostile work environment, she has not shown that Defendant is liable. Recall that, where

---

[12] Some earlier cases might be interpreted to discount that fact that the Supreme Court has held that, for discriminatory "harassment to be actionable, it must be sufficiently severe *or* pervasive." *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (emphasis added); *see also Oncale*, 523 U.S. at 78. As the court in 2013's *Bergbauer* decision stated, "Although the standard for a hostile work environment requires that conduct be severe *or* pervasive, courts generally find actionable claims only where the conduct is both quite severe and pervasive." 934 F. Supp. 2d at 77 (emphasis in original). More recent cases, however, have allowed that pervasiveness in the absence of severity can constitute a hostile work environment—although to be sufficiently pervasive, offensive conduct must typically be both regular and enduring. For example, while recognizing that "there is no precise formula or mathematical test to determine when conduct becomes 'pervasive,'" the court in *Thomas v. Securiguard Inc.* found that "a reasonable fact-

the hostile work environment is perpetrated by a co-worker rather than a supervisor, the plaintiff has the burden to show that the employer's response was negligent—that is, that "the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry*, 195 F.3d at 660. Where a supervisor creates such an environment, the employer has a heavier burden to show that it is not vicariously liable for the harassment. *See Vance*, 570 U.S. at 424.

The first question to be answered, then, is whether Bozeman was Plaintiff's supervisor. He was not. The Supreme Court explained in *Vance* that a supervisor is an individual who has the power "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Id.* at 431 (quoting *Ellerth*, 524 U.S. at 761). The record establishes that Bozeman had no such power over Plaintiff.[13] *See* note 5, *supra*. And so, Plaintiff must show that the Agency was negligent.

The Agency admits that it knew of the alleged harassment, as Plaintiff reported instances of Bozeman's conduct to their supervisor Lidder on January 7, 2021. *See* ECF No. 28-2, ¶ 46. Thus, the Agency's liability hinges on whether it "implement[ed] prompt and appropriate corrective

finder could conclude" that conduct and comments concerning the plaintiff's sexuality that occurred "two to three times a week from November 2015 to June 2016[] and from February to June 2016 . . . increased in frequency" were sufficiently pervasive "to permeate the workplace[] [and] unreasonably interfere with [the] plaintiff's ability to perform her duties." 412 F. Supp. 3d 62, 93–94 (D.D.C. 2019). Citing cases finding that allegations of negative racial comments that occurred nearly every day for three years and that discriminatory conduct that occurred nearly every day for four years stated hostile work environment claims, the court in *McArdle v. District of Columbia* found that comments that "were not themselves severe" could create a hostile work environment where they were made daily for a period of years. No. 19-cv-3637, 2025 WL 1167956, at *10–11 (D.D.C. Apr. 22, 2025) (first citing *Thomas*, 412 F. Supp. 3d at 94; then citing *Leftwich v. Gallaudet Univ.*, 878 F. Supp. 2d 81, 99–100 (D.D.C. 2012); and then citing *Tucker v. Howard Univ. Hosp.*, 764 F. Supp. 2d 1, 10 (D.D.C. 2011)). The Court finds that Bozeman's alleged sporadic conduct over the course of months was not sufficiently pervasive to state a claim here.

[13] Indeed, Bozeman would not be Plaintiff's supervisor even under the more lenient standard rejected by the *Vance* majority and championed by the dissenters, which "tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *Vance*, 570 U.S. at 431; *see also id.* at 451 (Ginsburg, J., dissenting).

action." *Curry*, 195 F.3d at 660. In determining whether remedial measures were reasonable, courts may consider "the amount of time that elapsed between the notice and remedial action, the options available to the employer, possibly including employee training sessions, transferring the harassers, written warnings, reprimands in personnel files, or termination, and whether or not the measures ended the harassment." *Id.* at 662 n.17 (emphasis omitted) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)).

A review of the Agency's response to Plaintiff's complaints leads to an easy answer: management implemented prompt and appropriate corrective action. Plaintiff emailed her complaint to Lidder at 7:15 a.m. on January 7, 2020. *See* ECF No. 28-2, ¶ 46. Lidder emailed Bozeman—who was presumably not on the premises since he went off duty at 7:30 a.m.—at 11:59 a.m. that same day, giving him "formal notification" that he should "not make any contact" with Plaintiff on "professional [or] personal matters . . . until further notice." *See id.*, ¶¶ 18, 47; ECF No. 28-12 at 2. Also, that same day, Lidder notified his supervisor Frazier about the allegations, who contacted higher-ups and Human Resources to identify someone to conduct a fact-finding investigation. *See* ECF No. 28-2, ¶¶ 48–49. Management had some trouble finding an appropriate individual, but Childs was assigned to the investigation on February 1, 2020, interviewed witnesses, and thereafter issued her report on February 25, 2020. *See id.*, ¶¶ 50, 69. Meanwhile, on January 14, 2020, at Plaintiff's request of that same day, Lidder instructed Bozeman to communicate with his supervisees electronically to limit his contact with Plaintiff. *See id.*, ¶ 55; ECF No. 28-13 at 2. On January 28, 2021, Plaintiff and Bozeman both received a memorialized reciprocal no-contact agreement, which is still in effect. *See* ECF No. 28-2, ¶ 59; ECF No. 33-9 at 243–44. On February 16, 2020, Bozeman was reassigned to a shift that did not overlap with Plaintiff's shift. ECF No. 28-2, ¶ 67; ECF No. 33-9 at 191. Bozeman was issued a letter of counseling on March 1, 2020, requiring him to complete

sexual harassment prevention training, which Bozeman did. *See* ECF No. 28-2, ¶¶ 71–72. Plaintiff

has made no further complaints of sexual harassment against Bozeman. *Id.*, ¶ 74. That is, remedial

action began without delay; management utilized various types of corrective action, including im-

plementing a no-contact order, changing Bozeman's shift, issuing him a letter of counseling, and

requiring him to undergo sexual harassment training; and that corrective action stopped the behavior

about which Plaintiff complained.

Plaintiff makes two perfunctory arguments comprising a handful of sentences in its opposi-

tion to Defendant's motion for summary judgment suggesting the Agency's response was unreason-

able:

> The VA designated Stacey Childs to conduct an investigation of the sexual harass-
> ment, but Ms. Childs never got in touch with Mr. Robinson.
>
> . . . .
>
> The Agency delayed in its fact finding:  "I am following up on the fact finding
> concerning Jeffery Bozeman sexual[ly] harassing me.  It has been over a month
> since I made my complaint and I have not heard from you, Heather[,] nor Tania
> concerning this.  I will be requesting time off t[o] deal with the anxiety that this
> whole situation has caused me."
>
> . . . .
>
> Finally, the Agency did not take appropriate action after Ms. Jackson complained
> about sexual harassment.  The Agency claims that it appointed Ms. Childs to con-
> duct an investigation but Mr. Robinson testified that he was never interviewed by
> Ms. Childs.

ECF No. 30 at 5, 6, 11–12 (quoting ECF No. 33-9 at 75).

The assertion that Childs did not interview Robinson is factually incorrect; the record here

conclusively shows that Childs interviewed Robinson, as explained above. *See* note 9, *supra*. In

any case, "the law does not require that investigations into sexual harassment complaints be per-

fect"; they must only be "reasonably calculated to prevent further harassment." *Mastripolito v.*

*Jefferson Health-New Jersey*, 583 F. Supp. 3d 622, 625 (D.N.J. 2022) (citation modified) (quoting *Knabe v. Bury Corp.*, 114 F.3d 407, 412 (3d Cir. 1997)).  That is precisely what this investigation did, as remedial actions were taken and Bozeman engaged in no further conduct toward Plaintiff that could reasonably be considered harassing (and Plaintiff has made no further formal complaints that Bozeman engaged in conduct that could reasonably considered harassing) since January 7, 2021.  *See, e.g.*, *Roof v. Howard Univ.*, 501 F. Supp. 2d 108, 116 (D.D.C. 2007) (finding that the fact that harassment stopped for a period of fifteen months after the employer's corrective action showed that the action was appropriate).

Plaintiff's complaint about delay fares no better.  The span from her first complaint about Bozeman to the conclusion of the fact-finding investigation was less than two months and included intermediate steps designed to address Plaintiff's complaints.  In *Pachura v. Austin*, the court dismissed the plaintiff's contention that the employer failed to take prompt and effective corrective action where its investigation took four months (twice as long as the investigation at issue here) because she "ignore[d] the crucial intermediary steps taken by Defendant to eliminate the possibility of harassment in the meantime, including the No Contact orders and immediately initiating an investigation into the allegations."  No. 6:21-cv-316, 2025 WL 371786, at *11 (N.D.N.Y. Feb. 3, 2025); *see also id.* ("The law does not require employers to complete investigations into allegations of harassment within a brief window.  Instead, it merely demands that the employer take some immediate and reasonable action to prevent the possibility of further harassment.").  Similarly, in *Kanauss v. City of Burlington*, the court found that remedial action that began on the same day as the plaintiff's complaint and included "measures . . . to prevent interaction," an investigation that was completed in three months, and a requirement that the harasser attend sexual harassment training, was "prompt and appropriate as a matter of law."  No. 19-cv-6474, 2020 WL

6523378, at *7–8 (D.N.J. Nov. 5, 2020). In *Goode*, the court found that the employer took prompt remedial action and granted summary judgment in its favor on the plaintiff's hostile work environment claim where it launched an investigation in response to the plaintiff's formal complaint of March 23, 2009, which was completed four-and-a-half months later, on August 7, 2009. 932 F. Supp. 2d at 85, 91.

Here, to the extent that Plaintiff objects to the three-week lag between her first complaint and the ultimate assignment of Childs to head the investigation, the record is clear that the managers moved promptly to find an investigator but were stymied by obstacles outside of their control. *See* ECF No. 33-9 at 133 (Deputy Chief of Business Operations Tania Bland noting "unsuccessful attempts" to assign someone outside of the Business Office to conduct fact-finding); *id.* at 168 (Frazier noting "the length of time it was taking to have someone assigned to conduct the fact finding"); *id.* at 191 (Frazier email explaining that "chaplain services and patient advocacy offices" were contacted to assist with fact-finding but they declined); *see also Johnson*, 811 F. Supp. 2d at 350 (opining that if remedial actions, including an investigation, were taken within two months of the employer's notice of the harassment allegations, that would likely meet the requirement of a prompt and appropriate response); *Reiter v. Oshkosh Corp.*, No. 09-c-239, 2010 WL 2925916, at *6 (E.D. Wisc. July 22, 2010) (finding that the employer's corrective action transferring the alleged harasser to separate the parties was prompt and appropriate where it occurred one month after the plaintiff's complaint "because of the holiday season" and the human resources director's vacation). More, effective remedies were put in place immediately, as noted above. *See, e.g.*, *Pachura*, 2025 WL 371786, at *11 (finding the steps put in place, including a no-contact order, were sufficient under the circumstances where the harassment did not continue); *Lopez v. Shulkin*, No. 16-cv-1112, 2018 WL 4688310, at *10 (D.N.M. Sept. 28, 2018) (finding sufficient the

employer's corrective action, including a directive for the alleged harasser not to enter the unit where the plaintiff worked, even where the alleged harasser apparently violated that directive by entering the unit but nevertheless did not interact with the plaintiff). Based on these undisputed facts, no reasonable factfinder could conclude that the Agency was negligent in its response to Plaintiff's complaints.

### IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, ECF No. 28, will be **GRANTED**. An appropriate Order granting the motion and closing the case will issue contemporaneously with this Memorandum Opinion.

**SO ORDERED.**

Dated:  August 19, 2025

_____
G. MICHAEL HARVEY
United States Magistrate Judge